Chicago, Rock Island & Pacific Railroad Company
*v.* Tankersley.

4-4874

Opinion delivered January 17, 1938.

*Thos. S. Buzbee, H. T. Harrison, A. S. Buzbee* and *Edward L. Wright,* for appellants.

*Winstead Johnson* and *S. S. Hargraves,* for appellee.

Griffin Smith, C. J.   The judgment for $3,000 which appellants seek to reverse is predicated upon the death of appellee's intestate, a nine-year-old girl.   The child was a deaf mute, but in other respects was normal, possessed of a bright mind.   She was struck and instantly killed by a fast passenger train at a public crossing in the town of Widener, in St. Francis county, on July 27, 1935.   It is alleged in the complaint that in walking southwardly toward the railway she was looking toward the southwest and did not look toward the east from whence the train came, and was oblivious to its approach.

There are three parallel tracks in the town of Widener, where the main line runs east-west.   A passing track is immediately north of the main line, and north of the passing track there is a seed house track, the latter, at the time of the tragedy, having been overgrown with weeds and partially obscured by dirt.   Highway No. 50 crosses the three tracks in the main part of the town, north and south.   The accident occurred at this crossing, near the north side of the main track.   The train which struck the child came from the east.   A secondary highway or crossing, with stock-gap, is maintained about a block east of the point where highway No. 50 crosses

the railway, and there is a seed house north of the rail-roads. The distance from the south wall of the seed house to the north rail of the main track is 44½ feet. The seed house is approximately 49 x 16 feet, its length of 49 feet paralleling the railways. On the south side of the main line, at a distance of 243 feet from the east edge of highway No. 50, a mail crane is maintained. The distance from the west wall of the seed house to the east edge of highway 50 is 150 feet.

Consideration of these figures will show that the east side of the seed house is 199 feet from the east edge of highway 50, and, therefore, the mail crane to which reference has been made was situated at a point south of the main rail line, 44 feet east of a north and south line that would parallel the east end of the seed house. These distances are important in view of allegations that the engineer was negligent in not discovering the perilous position of appellee's intestate in time to warn her of her danger, or in not checking the speed of the train.

Photographs show that the secondary railway cross-ing is some distance east of the mail crane, and even farther east of the seed house, and that the distance between the two crossings was substantially more than 243 feet. Two witnesses for appellee stated that the dis-tance was "about a block."

E. A. Rolf, Jr., a witness for appellee, testified that at the time the tragedy occurred he had just driven his automobile from a point in front of Dr. Winter's office to the post office. He said: "The child was coming south [walking on highway 50 from the north toward the series of tracks] when I went by the crossing. When I got down to the post office and got out of the car the train struck the child. I observed the train approach-ing from the east. When I first observed the train it was beyond the other crossing, which is the first cross-ing east of the highway 50 crossing. The two crossings are something like a block apart. It whistled beyond the other crossing. The gin and cottonseed house would obstruct the view of the engineer. He [the engineer]

would have had to cross the other [east] crossing before his view was clear so he could see the child.

"Q. How far back of highway 50 crossing was it that he blew his distress whistle. A. He was, I imagine, half way between the two crossings. Q. At the mail crane—would that be about the location? A. I imagine so. Q. He blew the distress whistle there? A. Yes, sir."

The witness further testified that, in his opinion, the train was running 50 miles an hour and the engineer did not slow down until after the child had been hit. On cross-examination, the witness testified:

"I was standing looking at the engine and saw the child just before the engine hit her. When I first observed the train coming and took notice of it, it was beyond the crossing—that is, east of the crossing where the accident occurred. I would guess the train was about a block beyond that crossing and about two blocks from the crossing where the accident occurred. At that point the little girl had not moved into position where the engineer could see her. I saw the train coming, and when it blew at the mail crane I got out of my car. When I came out of Dr. Winter's office I had noticed the little girl coming down the road, but up until the train blew I hadn't thought about an accident. I looked when the train sounded an alarm, and I saw an accident was impending. When I got out of my car the little girl was right close to the main track, or had reached it. She was still walking the last I saw. She was struck, I guess, by the pilot beam of the engine about a foot to the right [north] of the center. If the engineer made any effort to stop the train before striking the child, I could not tell it. He ran about a mile before he backed up."

The witness further testified that, in his opinion, the engineer could have seen the child from the time she crossed the house track until she walked onto the main line, but prior to the time she reached the house track, the view was obstructed by the seed house.

William Hendrick, a witness for appellee, testified that the train was near the mail crane when it blew

the distress signal. He said: "When I looked toward the crossing the child was walking up on the track, looking west toward Forrest City. I don't know whether she saw the train, or not, because the train obstructed my view. I think the train was about ten minutes late, and that it was running faster than usual. The regular schedule through Widener is 75 miles an hour, and I think he [the engineer] was going faster than that. The engine ran about five or six poles [telephone poles] before it stopped. I think the poles are about 150 feet apart. The way I saw it, it was the north end of the pilot beam that struck the little girl. I didn't see her struck, but just before she was struck. I saw her coming up there, and I had a little girl walk up to see about where she was struck, and it would be right close to the ties—close to the rail. That was the position she was in when I first saw her. My attention was attracted by the alarm whistle, and by the time I could take the situation in the accident happened. I was sitting about half way between the mail crane and the crossing. When I looked up and saw the little girl the whole thing was taking place. When I first noticed her she was looking west in the opposite direction from which the train was coming. She must have felt the vibration of the train."

Allen Gray, a witness for appellee, testified as follows: "I saw the little Moser girl as she came from Mr. Tankersley's house and then walked to the railroad —just an ordinary walk. About the time she got even with the gin office, which is about 60 feet from the crossing, she turned and walked west, going to the gin office, and then she continued on to the crossing. If she stopped before reaching the track I did not see her. I heard the distress whistle, but don't know where the child was at that time—about 25 feet, I guess, from the track. That was about the distance, I judge, from where I was, that she was from the track when the distress whistle was blown. If she had stopped when the distress whistle was blown she wouldn't have been hit. I signed a statement shortly after the accident, and at the time I gave the statement I was under the impression

that she hesitated, or stopped when she was about 30 or 40 feet from the crossing, but at this time I don't know whether she did or not.''

T. K. Lewis, a witness for appellee, testified: ''I looked and saw the child was very close, and all I could do was hope that she wouldn't get to the track. When I first heard the distress whistle, the train was between the mail crane and the crossing east of the one where the accident happened. For a space of about forty feet there was no obstruction to keep either the little girl from seeing the train or the engineer from seeing the little girl. I heard the train blow before I went into the post office. It blew for the highway crossing and the station. It was when I came out of the post office that I heard the alarm [distress] whistle. The train was then close to the mail crane. I couldn't tell whether the little girl had gotten to the track or not. She was mighty close. From then on everything was happening mighty fast. I heard the alarm and then the accident happened. I didn't pay any attention to his [the engineer] applying the brakes. I didn't see that. Some people saw fire flying from the wheels, but I didn't—I was too excited.''

P. D. Stover, a witness for appellants, testified:

''I am a locomotive engineer for the Chicago, Rock Island and Pacific Railway Company and have been fireman and engineer for forty-five years; engineer about thirty-eight years. Thirty-nine years of that time in the service of the Rock Island. I have as a regular run passenger trains 41 and 42 between Little Rock and Memphis. I was the engineer in charge of the train that struck the little girl at Widener in July, 1935. It was a first-class through train and did not make local stops. Only two stops between Memphis and Little Rock, at Forrest City and Brinkley. The required schedule was sixty miles an hour between Little Rock and Memphis. To maintain that schedule it is necessary to run faster sometimes.

''On the morning of the accident as I was approaching Widener I whistled for the station and also the road crossings east of Widener. When I got to the road cross-

ing east of Widener I saw this little girl coming from the north, coming south toward the main track. I saw her walking about the middle of the road or street, and I still had the whistle open. She approached the crossing to just about fifteen or twenty feet, maybe, and I commenced whistling the alarm whistle, which is for persons on the track, or the danger whistle. She came up to the passing track and kind of hesitated and started up again while I was still whistling the alarm whistle. She walked in between the pilot beam and the cylinder head. When I saw her I put the brakes on in emergency. She was about fifteen feet of the passing track at that time. It was when she hesitated and started up again that I put the brakes in emergency. When I first saw her the crossing whistle was blowing. That was when I saw her seem to hesitate and then start up again, and I then commenced whistling the alarm whistle and put the brakes on in emergency. By applying the brakes in emergency, I mean that is all you can do. That is the reserve you have, extra braking power, when you put your brakes on in emergency. That's as quick as you can make a stop.

"On the type of track we were running at the time and the equipment we were carrying I would say you couldn't stop the train under a quarter of a mile. That is as short a distance as I could have stopped it. There is nothing unusual about seeing people approaching the crossing. There isn't a day that I don't see them approach the crossings, go up and wait till the train gets by. I had no idea the child was going over the crossing until she hesitated and started again. Then I thought she might and I started the alarm whistle and put the brakes on. I didn't know the child. There was not anything unusual about her. She was just like people I see every day. She came up to the track from my side of the engine. The fireman was on the opposite side."

On cross-examination the witness testified:

"When I first saw the child she was walking up the incline south toward the track. She was about the middle of the road when I saw her. I didn't put on the emer-

gency brake when I first saw her. She was then quite a distance from the track.

"When I first started whistling for the crossing my train was about a quarter of a mile, or something like that, east of the crossing. That was not when I first saw the child. I hadn't seen her when I started whistling for the crossing. I figure that when I first saw her she was about thirty-five or thirty-nine feet from the main track. I could not have seen her farther back than that, because of a seed house there.

"I didn't attempt to put the brake in emergency until the child had hesitated like she was going to stop, and when I saw she was not going to stop I commenced whistling the alarm whistle and started putting on the brakes, and she walked right into the engine. The pilot beam didn't strike her. The cylinder hit her. The cylinder is about four feet back behind the front of the engine.

"I examined the front of the train after the accident. There was no sign of blood or anything except on the cylinder head. The train was about four minutes late that morning. I was running about on schedule. That is, sixty miles an hour.

"I go through Widener at sixty miles an hour and do not slow down unless there is some danger. I stopped in about a quarter of a mile after applying the brakes. When I applied the emergency brake I was about even with the mail crane. I may have been a little west of the mail crane."

Testimony of appellants' engineer that the whistle was blown for the secondary crossing and for the station, beginning approximately a quarter of a mile east of highway 50 crossing, is not in serious dispute. Appellee's witness Rolfe testified that the whistle was blown "beyond the other crossing." Another witness for appellee, T. K. Lewis, testified that he heard the train blow before he went into the post office, and added: "It was when I came out of the post office that I heard the distress whistle." Whether the whistle was blown or the bell rung continuously over a distance of eight

rods as the train approached the crossing is a question not seriously put in issue. Nor can it be said that the probability of accident was accelerated by excessive speed of the train, due to the fact that it was running late. One of appellee's witnesses estimated the speed at 50 miles per hour. Another said that the regular schedule through Widener was 75 miles an hour, and that he "thought the engineer was going faster than that." This same witness testified that the train was brought to a stop "within five or six telephone poles"—750 to 900 feet. The witness who testified to a speed of 50 miles said the train "ran about a mile before it backed up." One witness for appellee "thought" the train was about ten minutes late. The engineer said he was about four minutes late, that the required schedule through Widener was 60 miles an hour, and "I was running about on schedule—that is, 60 miles an hour." There is no satisfactory proof that the speed estimated by the engineer was being grossly exceeded, or that the train was proceeding at a speed so greatly in excess of the regular schedule that an extra hazard was created with respect to the public's utility of the crossing in question.

All witnesses agree that the distress signal was sounded shortly after the engine passed the secondary crossing. It is also in undisputed evidence that the little girl did not alter her speed of travel on account of the warnings after nearing the main track, for "she was still walking" when struck. Allen Gray, witness for appellee, in a written statement made shortly after the accident occurred, said: "I thought the little girl stopped or hesitated when she was about thirty or forty feet from the crossing." At the trial Gray did not have a clear memory as to this transaction, saying, "At this time I don't know whether she did or not." On redirect examination an attorney for appellee, in an obvious effort to have the witness testify by inference that something had been added to the statement after the witness signed it, asked this question: "You say you don't remember putting in here [referring to the signed statement] that she paused or hesitated?" To which the wit-

ness replied: "I didn't say that I didn't remember that."

With respect to the obstruction occasioned by the seed house, appellee's witness Lewis testified that "For a space of about forty feet there was no obstruction to keep either the little girl from seeing the train, or the engineer from seeing the little girl." Another witness for appellee (Leroy Courtney) was asked: "How far is it from where you can first get a good view from the seed house back up the right-of-way where the engineer, if he had been looking, could have got a good view of the girl?" His answer was: "I figure about ten or twelve yards after she passed the seed house you could look down the track . . . . The little girl was walking in an ordinary child's walk, just leisurely."

Counsel for appellee have engaged in some mathematical calculations in an effort to establish relative positions, from which inferences of negligence upon the part of the engineer may be drawn, but in the absence of reasonably definite information as to the position of the little girl and the location of the engine when it became possible for the engineer to see the child, the conclusions are entirely speculative.

The engineer admitted that when he saw the little girl she was about 35 to 39 feet from the track, walking; that there was nothing to indicate she intended to disregard the whistle, but that when she later hesitated and then started again toward the track, he put on the emergency brakes. Taking the testimony as a whole, this act probably occurred at a point slightly west of the mail crane—certainly not more than 264 feet from the danger point. At 60 miles an hour, the distance was covered in three seconds; at 75 miles an hour, as estimated by one of appellee's witnesses, the time required would have been 2.4 seconds.

In this case there was a tragedy preceding a tragedy—an affliction imposed by nature. The little girl was deaf. It is the opinion of this court that the unfortunate victim of modern transportation was completely oblivious to her surroundings, and that, in the circum-

stances, it was impossible for appellants' agent to guard against the unusual conduct occasioned by a condition of which he was ignorant. Exercise of that degree of care required of the engineer could not have prevented Emma Frances from walking to her death while listening to voices from within—voices which destiny had proclaimed should be denied her from the outside world.

It was error for the trial court to refuse appellants' request for an instructed verdict.

The judgment is reversed, and the cause dismissed.

HUMPHREYS and MEHAFFY, JJ., dissent.

MEHAFFY, J. (dissenting). I cannot agree with the majority in holding, which I think they in effect do, that this court can read the record and better judge the credibility of the witnesses and the weight to be given to their testimony, than the trial judge and jurors who see the witnesses, hear them testify, and have an opportunity to judge the facts that we do not have. The majority opinion admits that the jury is the judge of these things. I think in this case it is purely a question of fact, and that this court has simply constituted itself a jury and passed on the facts.

One witness swore that he was looking at the little girl when she walked onto the track, and that she was looking west, the opposite direction from which the train was coming. Nobody disputes this. The engineer swears that he saw the little girl, saw her going directly toward the track and did not use the emergency brake until after, he says, she hesitated and then went on.

The jury had a right to conclude that the engineer saw her and knew that she was looking in the other direction, and without doing anything at all to stop the train or check its speed when he first observed her danger, continued right on at a rapid rate of speed and ran over and killed her.

There is a conflict in the evidence as to what part of the engine struck her. One witness swears she was on the track, and other witnesses testified that they found blood near the center of the pilot beam. There were two crossings in the little town about a block apart, and the

evidence shows that for the first crossing the engineer sounded the whistle. There is no evidence that the statute was complied with as to sounding the alarm, continuously. The evidence shows conclusively that, after the engineer saw the little girl, saw her going right toward the track looking in the other direction, he did not make any effort to check the speed of the train, and some witnesses say that he did not sound the distress signal and put on the emergency brakes until after he had struck the girl. The engineer himself says that he did not put on the emergency brake when he first saw her. If he did not, and she was going straight toward the track looking in the opposite direction, the jury had a right to conclude that he was guilty of negligence.

Widener is a small town with a population of probably about three hundred, and yet one witness testifies that the train was going through the town at more than 75 miles an hour, and the engineer himself says that the schedule is 60 miles an hour for the whole trip, and that that makes it necessary to run faster than 60 at some times. All the witnesses agree that the train was late. The engineer says it was only about four minutes late, but the jury had a right to conclude, and probably did conclude, that he was running through the town at more than 75 miles an hour, saw the little girl approaching the track at a crossing, and knew that she was looking in the other direction, and oblivious to her danger; and yet it is admitted that he did not, when he first saw the child, make any effort to check the speed of the train.

The majority opinion says that it is the opinion of this court that the unfortunate victim of modern transportation was completely oblivious to her surroundings, and that it was impossible for appellant's agent to guard against the unusual conduct occasioned by a condition of which he was ignorant. I say that the evidence shows that she was completely oblivious to her surroundings, and as she was looking in the other direction and the engineer looking directly at her, he was bound to know that she was oblivious to her surroundings. According to the evidence he was not ignorant of the fact that he was going through a town; he was not ignorant of the

fact that the little girl was walking in the road directly toward the railroad crossing; he was not ignorant of the fact that she was looking in the opposite direction; he was not ignorant of the fact that he could immediately, when he saw the situation, have applied the emergency brake; and if the evidence of appellee's witnesses is true, the slightest checking of the speed of the train would have enabled the child to cross the track in safety.

The majority opinion says there was no satisfactory proof that the speed estimated by the engineer was being grossly exceeded or that the train was proceeding at a speed so greatly in excess of the regular schedule that an extra hazard was created. I think the proof is satisfactory, but the law does not require that it be satisfactory. In every case, so far as I know, where this court has passed on the question, it has held that the law does not require that the proof be satisfactory, but if there is any substantial evidence, the jury's verdict cannot be disturbed.

This court said: "We will not reverse the judgment because of the insufficiency of the evidence, for, as we view this evidence, it is not physically impossible that appellee was injured as the result of stepping into an unblocked frog, although it is highly improbable that the injury was caused in that manner." *Missouri N. Ark. Ry. Co.* v. *Johnson,* 115 Ark. 448, 171 S. W. 478.

Even if it were highly improbable that the facts relied on by appellee in this case were true, still we would not be justified in reversing it if there is any substantial evidence to support the verdict.

"The fact that the appellate court would have reached a different conclusion had the judges thereof sat on the jury, or that they are of the opinion that the verdict is against the preponderance of the evidence, will not warrant the setting aside of a verdict based on conflicting evidence." 4 C. J. 859, 860.

"The verdict of a jury cannot properly be disturbed on appeal merely because of its appearing to be against the clear weight of the evidence, or because, if we were to pass upon the matter as seen in the printed record.

we might find differently than the jury did. If the verdict has any credible evidence to support it, any which the jury could in reason have believed, leaving all mere conflicting evidence, evidence short of matter of common knowledge, conceded or unquestionably established facts and physical situations, it is proof against attack on appeal, and that must be applied so strictly, on account of the superior advantages of court and jury for weighing the evidence, that the judgment of the latter approved by the former is due to prevail, unless it appears so radically wrong as to have no reasonable probabilities in its favor after giving legitimate effect to the presumption in its favor and the make weights reasonably presumed to have been rightly afforded below which do not appear, and could not be made to appear, of record.'' *Barlow* v. *Foster,* 149 Wis. 613, 136 N. W. 822.

''Under our system of jurisprudence it is province of the jury to pass upon the facts. It is not only their privilege, but their right, to judge of the sufficiency of the evidence introduced, to establish any one or more facts in the case on trial. The credibility of the witnesses, the strength of their testimony, its tendency, and the proper weight to be given it, are matters peculiarly within their province. The law has constituted them the proper tribunal for the determination of such questions. To take from them this right is but usurping a power not given. . . . When there is a total defect of evidence as to any essential fact, or a spark, a 'scintilla,' as it is termed, the case should be withdrawn from the consideration of the jury.'' *Baldwin* v. *Wingfield,* 191 Ark. 129, 85 S. W. 2d 689.

''In ordinary civil actions a fact in issue is sufficiently proved by a preponderance of evidence, and the verdict or finding should be based upon the preponderance of the evidence, whether the evidence is direct or circumstantial. Under this rule, a party is not required to prove his case 'beyond a reasonable doubt,' 'beyond doubt,' 'beyond any doubt,' 'beyond question,' 'conclusively,' 'to a cerainty,' or a 'moral' 'reasonable,' or 'absolute' certainty, 'to the satisfaction of the jury,' or by evidence which is 'clear and conclusive,' 'clear and sat-

isfactory,' 'clear and unequivocal,' 'positive and conclusive,' or such as to 'satisfy' the jury, or 'exclude the truth of any other theory.' It is not indispensable that his evidence should be even equal to the testimony of one unimpeached witness. All that is required of the party at the outset is to give competent evidence sufficient, if undisputed, to establish the truth of his averments." 23 C. J. 12 *et seq.*

"There is no doctrine of the law settled more firmly than the rule which authorizes issues of fact in civil cases to be determined in accordance with the preponderance or weight of the evidence. The reason of the rule no doubt is, that as between man and man, where a loss must fall upon one or the other, it is right that the law should cast it upon him who is shown to have been the cause of the loss, by proof establishing the reasonable probability of the fact." 10 R. C. L. 1012.

Hundreds of cases might be cited that support this doctrine. One witness testified that the train was going more than 75 miles an hour. Has this court any right to say that this witness did not tell the truth? Or to pass on his credibility or the weight to be given to his testimony? Under all of our decisions it has no such right.

The majority, however, in its opinion, holds that the engineer told the truth, and the other witnesses did not.

It cannot be stated too often that under our system, *the jury, and not this court, is authorized to pass on the credibility of the witnesses and the weight of their testimony.*

I think the judgment should be affirmed. Mr. Justice HUMPHREYS agrees with me in this dissenting opinion.